UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| SOUTH CANAAN CELLULAR INVESTMENTS, LLC, and | : | |
| | : | |
| SOUTH CANAAN CELLULAR EQUITY, LLC | : | Bankruptcy No. 09-10473bf |
| Debtors | : | (Jointly Administered with 09-10474) |

_____

| | | |
|---|---|---|
| SOUTH CANAAN CELLULAR INVESTMENTS, LLC, and | : | |
| | : | |
| SOUTH CANAAN CELLULAR EQUITY, LLC | : | |
| Plaintiffs | : | |
| v. | : | |
| LACKAWAXEN TELECOM, INC. and FRANK M. COUGHLIN | : | Adversary No. 09-0218 |
| Defendants | : | |

_____

..................................................

MEMORANDUM

..................................................

The above-captioned plaintiffs/debtors have objected to secured proofs of claim filed by defendant Lackawaxen Telecom, Inc. ("LTI") as a component of their complaint in this proceeding. See Fed. R. Bankr. P. 3007(b). These proofs of claim, dated June 1, 2009 and docketed on the claims register as claim #3 in each of the debtors' cases, assert that the debtors jointly owe $13,534,231.76 as of the date of their bankruptcy filings. Ex. LTI-1. Furthermore, it is agreed that LTI is an oversecured creditor in these

jointly administered cases, and so the provisions of 11 U.S.C. § 506(b) may be applicable.

Without consideration of attorneys' fees and costs, LTI contends that it is owed, through

May 27, 2010, $7,120,413 in unpaid principal and $7,057,520 accrued interest totaling

$14,177,933. Ex. LTI-14. It seeks an additional $1,473,561.68 in attorneys' fees and

expenses, for an aggregate allowance as of May 27, 2010 of a secured claim in the

amount of $15,651,494.68.

The debtors object that LTI has overstated its prepetition and postpetition

accrued interest under the relevant loan documents. They maintain that as of April 28,

2010, LTI was owed only $9,534,765.11, consisting of $7,120,413.28 in principal, and

$2,414,351.83 in accrued interest. Ex. D-24.[1] They also contend that allowance of fees

sought by LTI under section 506(b) is unreasonable, and therefore that fee allowance

must be significantly reduced.

An evidentiary hearing was held and the parties thereafter submitted post-

trial memoranda and lodestar time sheets regarding counsel fees. Thus, these claim

objections are ripe for determination.

I make the following factual findings in narrative format.

---

[1]The debtors also contend that defendant Coughlin violated various fiduciary
duties owed to them, and that defendant LTI aided and abetted those breaches. Thus, they assert
that LTI's allowed claim must be further reduced.
By memorandum and report dated March 25, 2010, I concluded that defendant
Coughlin owed no fiduciary obligations to the debtors, and so LTI could not be held liable for
aiding and abetting in those breaches. See Globis Partners, L.P. v. Plumtree Software, Inc., 2007
WL 4292024, at *15 (Del. Ch. 2007). That conclusion is under review by the district court.
Although all parties requested that I resolve the debtors' objection to LTI's claims without
awaiting the outcome of the district court review, it is understood that my resolution is without
prejudice to the debtors' aiding and abetting claim if the district court should uphold it.

I.

The debtors are two limited liability companies organized under the laws of the state of Delaware. Both debtors are partners in a limited partnership known as South Canaan Cellular Communications Company, L.P. ("SCCCC, LP"). Debtor South Canaan Cellular Investments, LLC ("Investments") is the general partner of SCCCC, LP. Debtor South Canaan Cellular Equity, LLC ("Equity") is a limited partner of SCCCC, LP. Investments and Equity hold 1% and 39.8% partnership interests in SCCCC, LP respectively. Non-debtor South Canaan Telephone Company (SCTC) holds a 10.2% limited partnership interest. See In re South Canaan Cellular Investments, Inc., 427 B.R. 44, 50 (Bankr. E.D. Pa. 2010).

On or about October 26, 2000, Investments and Equity jointly entered into a Master Loan Agreement ("MLA") with CoBank, ACB ("CoBank"). Investments and Equity are collectively referred to as "the Co-Borrowers" in this loan agreement. On the same date, the Co-Borrowers executed: a First Supplement to the Master Loan Agreement with CoBank; a promissory note in the amount of $7,500,000 in favor of CoBank; and a security agreement plus a separate pledge agreement in favor of CoBank, which agreements encumbered the debtors' property, including their limited partnership interests. See Joint Pretrial Statement of Uncontested Facts, ##1-4; ex. LTI-1. These documents all provided that Colorado state law would apply to any disputes. See Joint Pretrial Statement of Uncontested Facts, #7; ex. LTI-1.

Certain terms of the loan agreements are discussed below and are construed differently by the debtors and LTI. There is no dispute, however, that CoBank indeed

3

loaned the Co-Borrowers $7,500,000.  See Joint Pretrial Statement of Uncontested Facts, ##5-6.[2]  There is also no dispute that the Co-Borrowers failed to make a requisite loan payment to CoBank in April 2003.  See Joint Pretrial Statement of Uncontested Facts, #8. This payment was due on April 20, 2003, and was in the amount of $274,867.68, of which $187,500.00 constituted a partial repayment of principal.  Ex. D-7 (Activity Statement, pg M-3i).  Nor is it disputed that since April 20, 2003, the Co-Borrowers have failed to tender any principal or interest payments on the CoBank loan.  See Joint Pretrial Statement of Uncontested Facts, #11; Fact Stipulation, #4.  As of May 1, 2003, the Co-Borrowers owed CoBank $7,125,000 in unpaid principal.  See exs. LTI-1; D-7; D-24.  It is stipulated that since June 3, 2004, the outstanding principal loan balance is $7,120,413.28.  Fact Stipulation, #3.[3]

On or about May 1, 2003, CoBank sent the Co-Borrowers a letter informing them that their loan had been designated as being on non-accrual status. CoBank's letter further stated that the Co-Borrowers' loan would be "charged the default rate of interest" for non-payment "as defined under the Loan Agreement," effective April 22, 2003.  See Joint Pretrial Statement of Uncontested Facts, #9; ex. D-6.  CoBank's May 1, 2003 letter did not specify which "default rate of interest" identified in the loan documents would be applied to the Co-Borrowers.  Additionally, the letter made no reference to any election

---

[2]Actually, there were two loans made by CoBank.  See ex. D-7.  The parties treat these two loans as combined for purposes of this claims objection and so shall I.

[3]Although the debtors made no payments on the CoBank loan after April 2003, there was a small reduction in the principal balance of $4,586.72 in June 2004, owing to CoBank's application of patronage capital to the principal balance.  See Fact Stipulation, #2; Joint Pretrial Statement of Uncontested Facts, #11, n.1.

4

by CoBank to accelerate the balance of the Co-Borrowers' loan.  <u>See</u> Joint Pretrial
Statement of Uncontested Facts, #10; ex. D-6.

Mr. Kenneth Allen, a CoBank vice president, acknowledged that CoBank
never notified the Co-Borrowers that their principal loan balance had been accelerated,
N.T., at 91, nor did it ever demand payment of the entire principal loan balance plus
accrued interest.  N.T., at  53.  Thus, the billing statement sent by CoBank to the Co-
Borrowers in April 2003 identified the variable loan rate then charged by the lender as
2.950%, and itemized the $274,867.68 payment owed as comprised of $87,367.68 in
accrued interest and $187,500.00 in principal reduction.  Ex. D-7 (Activity Statement,
pgs. M-3h, M-3i).  The statement sent in June 2003, after the May 2003 default letter,
specified that the "current variable [interest] rate" being charged was 9.62%.  This
statement demanded payment from the CoBorrowers of $621,000.15, consisting of
$246,000.15 in accrued interest (of which $87,367.68 had been billed previously and
unpaid) and $375,000.00 in principal reduction (of which $187,000.00 had been billed
previously and unpaid).  The additional interest and principal payments listed in the June
2003 invoice are identified as due on July 21, 2003.  Ex. D-7 (Activity Statement, pgs. M-
3l, M-3m).[4]  The September 2003 billing statement sent by CoBank to the Co-Borrowers
demanded payment of $983,744.31, which amount included the missed payments in April
and July 2003, and added an additional payment of $175,164.16 in accrued interest at the
variable rate of 9.62%, plus an additional principal reduction of $187,500.00, payable by
October 20, 2003.  Ex. D-7 (Activity Statement September 2003, pgs M-3s to M-3u).

---

[4]The July and August 2003 activity statements sent by CoBank are identical to the
June 2003 statement.  Ex. D-7, pgs. M-3o to M-3r.

Indeed, all account statements sent by CoBank between June 2003 and

CoBank's assignment of the loan to LTI in October 2007 specified the variable interest

rate CoBank believed was applicable for that time period as well as the accrued interest

due and the principal balance reductions then owing.  Ex. D-7.  Furthermore, as will be

discussed below, these invoices were consistent in demanding additional principal

reduction payments in accordance with the quarterly payment schedule found in the First

Supplement to the MLA.

It is agreed by the parties that on or about October 24, 2007, CoBank and

LTI executed a bill of sale, as well as assignment and assumption of obligations, through

which LTI purchased and accepted an assignment of the Co-Borrower Loan.  See Joint

Pretrial Statement Uncontested Facts, #12; ex. D-11.  LTI paid CoBank $5,250,000 for

this loan assignment.  Ex. D-11.  Attached to the bill of sale was a schedule prepared by

CoBank.  This schedule purported to represent the "total amount of assigned

indebtedness."  Id.  The total indebtedness assigned to LTI was itemized by CoBank as

follows:

| | |
|---|---|
| Principal | $7,120,413.28 |
| Accrued Interest | $3,959,368.66 |
| | |
| Unreimbursed Legal Costs | $7,791.67 |
| Other Unreimbursed Costs | $8.00 |

Ex. D-11.  The interest calculation in the bill of sale does not include compound interest.

N.T., at 108.

In May 2008, after its assignment of the loan to LTI, CoBank reviewed its

earlier computations of accrued interest and principal in connection with the Co-Borrower

6

Loan and the bill of sale to LTI.  See ex. D-20.  This review revealed to CoBank that the schedule attached to the bill of sale to LTI contained erroneous information.  Id.

CoBank concluded in May 2008 that under the MLA (to be discussed below) the proper accrued interest rate payable by the Co-Borrowers was the applicable National Variable Rate ("NVAR") plus a default penalty of 4%.  CoBank further believed that this default interest rate was applicable against the outstanding principal balance.  Id.  However, CoBank had invoiced the Co-Borrowers, and had disclosed to LTI in its bill of sale schedule, an accruing interest rate of NVAR plus a default penalty of 5.62%.  Id.  If a default rate of NVAR plus 4% should have been applied to the entire outstanding principal balance between April 2003 and October 2007, then CoBank overstated to LTI the amount of unpaid, accrued interest owed by the Co-Borrowers as of October 24, 2007 by $529,442.89.  Joint Pretrial Statement Uncontested Facts, #14.

CoBank sent a spreadsheet analysis to LTI in May 2008.  Ex. D-20.  The spreadsheet computes accrued interest prior to assignment of the loan to LTI using NVAR plus 4% in one table, and NVAR plus 5.62% in another.  In both instances, the accrued interest is computed based upon an unpaid principal balance of $7,120,413.28.  No declining balance computations reflecting missed principal payments are included.

In addition to receiving these amended loan calculations, LTI learned in May 2008 that CoBank had never given the Co-Borrowers notice that it was accelerating the principal balance of the Co-Borrower loan.  See ex. D-21.  Furthermore, it is undisputed that LTI never notified the Co-Borrowers that it was accelerating the principal balance.  See Joint Pretrial Statement Uncontested Facts, #15.

7

II.


LTI's exhibit 1 contains accurate copies of the MLA, the First Supplement

to the MLA, as well as the promissory notes and security agreements and partnership

pledge agreements signed by the debtors.  There is no dispute that the debtors provided

CoBank with a security interest in their ownership interests in SCCCC, LP.  Indeed, the

purpose of the CoBank loan to the debtors was to fund the purchase of such partnership

interests.  <u>See</u> First Supplement to the MLA, section 2.

Furthermore, the MLA, promissory notes, security agreements and pledge

agreements all contained provisions that permitted CoBank to assess the Co-Borrowers'

reasonable attorneys' fees.  <u>See</u>, <u>e.g.</u>, Security Agreements, section 8(B); Pledge

Agreements, section 9(C).  Those provisions will be detailed below in connection with

LTI's fee reimbursement request under 11 U.S.C. § 506(b).

Before identifying provisions of the various loan documents relevant to a

computation of accrued interest, I accept the debtors' testimony that these documents

were drafted by counsel for CoBank, albeit reviewed by counsel for the Co-Borrowers.

N.T., at 50-51.  The terms and structure of the documents, as well as their headers and

footers, support the debtors' testimony on this point.

In detailing relevant loan document provisions, I start with the First

Supplement to the MLA.  The MLA supplement contains provisions that establish the Co-

Borrowers' payment obligations to CoBank, as well as the loan interest rate.  As for the

interest rate, the Co-Borrowers had the right to choose one of three different rate options:

8

"LIBOR (section 5(A)(2)); "Quoted Fixed Rate Option" (section 5(A)(3)); or "Weekly

Variable Rate" option (section 5(A)(1).  Section 5, Interest, of the Supplement states:

> (A) Rate Options; Etc. The unpaid principal balance of each
> advance under the Loan shall accrue interest at the rate or
> rates determined or selected by the Co-Borrowers in
> accordance with this Section 5(A).

It appears from the documents in evidence either that the Co-Borrowers

elected the Weekly Variable Rate option, or that this option was applied in the absence of

any affirmative election.  See First Supplement MLA, section 5(A)(4).  The Weekly

Variable Rate option was defined in the loan supplement, section 5(A)(1), as follows:

> Weekly Variable Rate Option. As to the portion of the unpaid
> principal balance of the Loan selected by the Borrower (such
> portion, and each portion selected pursuant to Sections
> 5(A)(2) or 5(A)(3) below, is hereinafter referred to as a
> "Portion" of the Loan), interest shall accrue pursuant to this
> variable rate option at a variable annual interest rate (the
> "Variable Rate") equal at all times to the rate of interest
> established for the Borrower by CoBank in its sole and
> absolute discretion on the first Business Day of each week.
> The rate of interest so established by CoBank may not exceed
> CoBank's National Variable Rate (as hereinafter defined) in
> effect on the date so established and shall be effective from
> and including the first Business Day of each week to and
> excluding the first Business Day of the next week.  Each
> change in the Variable Rate shall be applicable to the Portion
> of the Loan subject to this option and information about the
> then current Variable Rate shall be made available upon
> telephonic request.  The term "National Variable Rate" shall
> mean the rate of interest established by CoBank from time to
> time as its National Variable Rate, which rate is intended by
> CoBank to be a reference rate, and not its lowest rate.  The
> National Variable Rate will change on the date established by
> CoBank as the effective date of any change therein and
> CoBank agrees to notify the Borrower promptly after any
> such change.

(Emphasis added).

The First Supplement MLA, section 5(A)(4), also added:

> Upon the occurrence and during the continuance of an Event
> of Default, as the Interest Periods for Portions of the Loan
> accruing interest at a Quoted Rate or LIBOR Option rate
> expire, at CoBank's option, such Portions of the Loan shall be
> converted to the Variable Rate option and the Quoted Rate
> and the LIBOR Option rate will not be available to the Co-
> Borrowers until all Events of Default are no longer
> continuing.

Mr. Allen, CoBank's officer, explained that the weekly variable rate is "a

rate that we use depending on the credit quality, the customer, and that rate would be

fixed for one week. It's separate by customer, it's separate by loan, it can be different."

N.T., at 86. In contrast the NVAR was not borrower specific. Until December 2008, the

NVAR and the prime interest rate were almost identical. N.T., at 117; see ex. LTI-10

(CoBank's calculation of the National Variable Rate or "NVAR" from November 2002

through April 2010).

The MLA supplement also required the Co-Borrowers to pay accrued

interest four times per annum:

> (B) Payment and Calculation. Interest shall be payable
> quarterly in arrears on the 20th day of each January, April,
> July and October, commencing January 20, 2001. Interest
> shall be calculated on the actual number of days the Loan is
> outstanding on the basis of a year consisting of 360 days.

First Loan Supplement MLA, section 5(B). Similarly, the Co-Borrowers were obligated

to repay the principal balance of the CoBank loan in quarterly payments:

> The outstanding principal balance of the Loan shall be repaid
> in 26 consecutive quarterly principal payments due on the
> 20th day of each January, April, July and October (each such
> date, a "Payment Date"), commencing on October 20, 2002,
> with the last such monthly installment due and payable on
> January 20, 2009 (the "Maturity Date").

10

First Loan Supplement MLA, section 7.  The percentage of the principal loan balance

owed on the scheduled payment dates varied over the life of the loan, starting at 2.5% of

the outstanding balance for a number of years, and then increasing by 1.25% increments

over time.  Id.

The above-quoted provisions of the First Supplement to the MLA are not

controverted by the parties.  Nor is it disputed that the debtors made the October 2002 and

January 2003 principal reduction payments.  The proper application of certain provisions

of the MLA itself, however, are vigorously disputed.

I find the following provisions of the MLA relevant to the debtors' claims

objection and the allowance of LTI's secured claim:

Sections 7(H)(1), (2) of the MLA required the Co-Borrowers and South

Canaan Cellular Communications Company, L.P.—the limited partnership in which they

held a 40.8% interest—to provide CoBank with quarterly and annual financial statements

that included a balance sheet and a statement of income.  In addition, MLA sections 7(I)

and (J) required the limited partnership to maintain a ratio of indebtedness to operating

cash flow (total leverage ratio), and a debt service ratio that did not exceed certain

specified amounts at certain times: e.g., 3.5/1.0 (former); 1.75/1.0 (latter).

Section 9 of the MLA listed twelve events of default of the loan agreement.

They included:

> (A) Payment Default.  Any Co-Borrower should fail to make
> any payment to CoBank when due hereunder, under any Note,
> or under any other Loan Document to which it is a party, or

should fail to make any investment in CoBank required to be made hereunder when due.[5]

\*\*\*

(H) Insolvency, Etc.  Any Co-Borrower or any of its subsidiaries should: (i) become insolvent or should generally not, or should be unable to, or should admit in writing its inability to, pay its debts as they come due; or (ii) suspend its business operations or a material part thereof or make an assignment for the benefit of creditors; or (iii) apply for, consent to, or acquiesce in the appointment of a trustee, receiver, or other custodian for it or any of its property or, in the absence of such application, consent, or acquiescence, a trustee, receiver, or other custodian is so appointed; or (iv) commence or have commenced against it any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, which, in the case of a proceeding commenced against any Co-Borrower or any of its subsidiaries, is not dismissed within 45 days.

\*\*\*

Once an Event of Default exists, it shall be deemed to continue, notwithstanding any curative action by the Co-Borrowers, unless and until CoBank, in its sole discretion, shall state in writing that the Event of Default no longer exists or has been waived.

Section 10 of the MLA provided CoBank with certain remedies upon

default by the Co-Borrowers.  Those remedies included:

Upon the occurrence of an Event of Default under Subsection 9(H) hereof, the entire unpaid principal balance of the Loans, all accrued interest thereon, and all other amounts payable under this Agreement, all Supplements, all Notes and all other Loan Documents and all other agreements between CoBank and the Co-Borrowers shall become immediately due and payable without protest, presentment, demand or further notice of any kind, all of which are hereby expressly waived by the Co-Borrowers.  In addition, upon the occurrence and during the continuance of any Event of Default, CoBank may, upon notice to the Co-Borrowers:

---

[5]Section 7(L) of the MLA required the Co-Borrowers to purchase non-voting participation certificates in CoBank at certain times.

(A) Termination and Acceleration.  Terminate any commitment and declare the entire unpaid principal balance of the Loans, all accrued interest thereon, and all other amounts payable under this Agreement, all Supplements, and the other Loan Documents to be immediately due and payable.  Upon such a declaration, the unpaid principal balance of the Loans and all such other amounts shall become immediately due and payable, without protest, presentment, demand, or further notice of any kind, all of which are hereby expressly waived by the Co-Borrowers.

***

(D) Default Rate of Interest.  In addition to the rights and remedies set forth above: (i) if the Co-Borrowers fail to purchase any equity in CoBank when required or fails to make any payment to CoBank when due, then at CoBank's option in each instance, such obligation or payment shall bear interest at 4% per annum in excess of CoBank's National Variable Rate, (ii) upon the occurrence and during the continuance of an Event of Default, at CoBank's option, the unpaid balances of the Loans shall bear interest at 2% per annum in excess of the rate otherwise applicable thereto and (iii) after the maturity of any Loan, whether by reason of acceleration or otherwise, the unpaid balance of the Loan shall automatically bear interest at 4% per annum in excess of CoBank's National Variable Rate.  All interest provided for herein shall be payable on demand and shall be calculated from the date such payment was due to the date paid on the basis of a year consisting of 360 days.

Additional relevant provisions of the MLA include:

SECTION 13. Applicable Law.  Except to the extent governed by applicable federal law, this Agreement and each Supplement shall be governed by and construed in accordance with the laws of the State of Colorado, without reference to choice of law doctrine.

SECTION 14. Notices.  All notices hereunder or under any Supplement shall be in writing. . . .

SECTION 15. Costs, Expenses and Taxes.  To the extent allowed by law, the Co-Borrowers agree to pay all reasonable out-of-pocket costs and expenses (including the fees and expenses of counsel retained by CoBank) incurred by CoBank in connection with the origination, negotiation,

13

documentation, administration, collection, and enforcement of
this Agreement and the other Loan Documents. . . .

SECTION 18. Successors and Assigns.  This Agreement,
each Supplement, and the other Loan Documents shall be
binding upon and inure to the benefit of the Co-Borrowers
and CoBank and their respective successors and assigns. . . .

There is no provision in the loan documents that authorizes compounding of
accrued interest.  N.T., at 48-49.  None of the invoices sent to the debtors by CoBank
included compound interest.  N.T., at 72, 108-09.  Nor did invoices sent by LTI to the
debtors after the loan assignment from CoBank include a compound interest demand.
N.T., at 72-73.  The proofs of claim filed by LTI were based upon a NVAR rate schedule
prepared by accountants for LTI, see ex. D-20, with a default penalty of 4%, with interest
compounded daily, and with LTI assuming that the CoBank loan had been accelerated.
See ex. D-27; N.T., at 22, 28-29, 42, 47.  The debtors' president acknowledged that
CoBank was entitled to a default interest rate as of the April 2003 non-payment.  N.T., at
76-77.

In June 2007, a CoBank credit analyst opined in an internal CoBank email
that a 2% default penalty should have been charged to the debtors after their loan default.
Ex. D-9.  Apparently, this was based upon the analyst's interpretation of the loan
documents and the fact that CoBank never formally notified the debtors that the loan
balance was accelerated.  See ex. D-14, at 24082 (internal CoBank email from C.
Schaffer to M. Martinez).[6]  However, there is no evidence that the Co-Borrowers were

---

[6]LTI argues that this email is inadmissible as lacking "foundation," irrelevant, and
hearsay.  As I find the MLA interpretation expressed in the email unpersuasive and not binding
upon CoBank or LTI, I have noted it simply as an opinion reached by a CoBank employee.

ever informed of the CoBank analyst's opinion, nor that the invoices sent to them by

CoBank ever varied from accruing interest at NVAR plus 5.62%.

As will be discussed below, I agree with Mr. Allen that CoBank (and LTI)

were entitled to charge the Co-Borrowers a default rate of interest of 4% plus NVAR.  I

differ from Mr. Allen and LTI on the proper method of applying that default interest rate.

II.

A.

The Third Circuit Court of Appeals has instructed that a shifting evidentiary

burden arises when an objection has been filed to a proof of claim.  In re Allegheny

International, Inc., 954 F.2d 167, 173 (3d Cir. 1992); see In re Graboyes, 371 B.R. 113

(Bankr. E.D. Pa. 2007).  Application of that shifting burden was explained in In re

Kincaid, 2008 WL 2278895, at *2 (Bankr. E.D. Pa. 2008):

> Bankruptcy Rule of Procedure 3001(f) provides that a proof
> of claim executed and filed in accordance with the rules of
> procedure constitutes prima facie evidence of the validity and
> amount of the claim. . . .  Even if there is an objection filed to
> the claim, the evidentiary effect of Rule 3001(f) remains in
> force. . . .  The objecting party carries the burden of going
> forward with evidence in support of its objection which must
> be of probative force equal to that of the allegations of the
> creditor's proof of claim. . . .  "[T]he objector must produce
> evidence which, if believed, would refute at least one of the
> allegations that is essential to the claim's legal sufficiency."
> In re Allegheny International, Inc., 954 F.2d 167, 173-74 (3d
> Cir. 1992).  If the objecting party succeeds in overcoming the
> prima facie effect of the proof of claim, the ultimate burden of
> persuasion then rests on the Claimant.  Id. at 174.

15

(citations omitted).

        Here, LTI has filed two proofs of claim that meet the requirements of Fed.

R. Bankr. P. 3001.  Thus, these proofs of claim constitute "prima facie evidence of the

validity and amount of the claim."  The burden of production shifted to the debtors, as

objectors, to negate the validity of LTI's proofs of claim.  If the debtors met this burden,

then LTI had the ultimate burden of persuasion to demonstrate the validity of its claims

by the preponderance standard.  In re Allegheny International, Inc., 954 F.2d at 174.


B.


        As mentioned above, the loan documents provide that Colorado state law is

applicable.  Under Colorado law, compound interest is permitted by statute in certain

instances not relevant in this adversary proceeding, see C.R.S.A. § 13-21-101, and by

court discretion for breach of fiduciary duty, see Heller v. First Nat. Bank of Denver,

N.A., 657 P.2d 992, 997-98 (Colo. App. 1982), also not germane.  In consumer loan

transactions, C.R.S.A. § 5-12-102 specifies an interest rate and permits limited

compounding of interest when no interest rate is expressed in the loan agreement itself.

Here, however, the loan agreements specify an interest rate and this loan is not a

consumer loan transaction.  In these circumstances, the Colorado Supreme Court has

stated that "[c]ompound interest is allowable only when definitely agreed upon."

Tarabino Real Estate Co. v. Tarabino, 109 Colo. 425, 432 (1942); see also Parker v.

McGinty, 77 Colo. 458, 461 (1925) ("This court has held that interest on coupons is not

compound, and may be lawfully contracted for and recovered.").  As the Co-Borrower

16

loan documents are silent as to compounding, simple interest computation is required. (Indeed, CoBank itself never sought compound interest from the debtors.)

LTI's proofs of claim, as well as its calculation of accrued postpetition interest, are based upon computations that compounded interest on a per diem basis. As neither the loan agreements nor Colorado state law permit such compounding, the debtors' objection to that portion of LTI's proofs of claim including compound interest will be sustained. Only simple interest is allowable.

## C.

The parties also are divided on the proper method to ascertain the relevant interest rate for all accrued interest from April 2003. The debtors argue that the relevant rate should be the non-default "Weekly Variable Rate" from April 23, 2003 through April 28, 2010—the latter date being chosen in the erroneous belief that it is the effective date of the debtors' joint confirmed plan.[7] Alternatively, the debtors contend that the default interest rate should be computed at 2% above the Weekly Variable Rate from April 2003 until January 20, 2009, when the loan matured. The debtors maintain that as CoBank never notified the debtors of any variable rate besides NVAR plus 5.62% in its post-default invoices, which default rate was incorrect, the Weekly Variable Rate charged by

---

[7]The effective date of the confirmed plan was defined as "twenty (20) Business Days after the date the Confirmation Order becomes a Final Order." Debtors' Joint Second Amended Plan, ¶ 2.20. The confirmation order became final under Fed. R. Bankr. P. 8002 on April 9, 2010. Twenty business days thereafter was May 7, 2010, which is the actual effective date.

CoBank to SCCCC, LP should be applied, as the Weekly Variable Rates for the Co-Borrowers and the limited partnership were the same prior to the April 2003 default.  See N.T., at 56-58.  After loan maturity, the appropriate interest rate would be the National Variable Rate plus 4%, until the plan effective date.[8]  Furthermore, the debtors argue that if any default interest rate is applied, it can only be applied to the unpaid quarterly principal payments due, and not to the entire principal balance outstanding.  See ex. D-25.

LTI counters that the contractually agreed-upon interest rate after the Co-Borrowers defaulted in April 2003 is the National Variable Rate plus a 4% default rate through the effective date of the debtors' plan.  CoBank's error in computing that interest rate does not undermine, in LTI's opinion, either the lender's entitlement to the proper default rate or its intention to choose the highest contractually permissible rate.  Moreover, LTI contends that the default rate applies to the entire outstanding principal balance owing, as that entire sum became due upon default in April 2003.  In other words, LTI argues that the entire loan balance was accelerated at that time.

Both LTI and the debtors focus upon the language of the MLA and its First Supplement, quoted above, to support their respective positions.  Moreover, the debtors argue that to the extent the contractual provisions are ambiguous, and as CoBank was the drafter, any ambiguity should be construed in the debtors' favor.  Furthermore, as LTI took an assignment from CoBank, it obtained all the rights and was subject to all the limitations that CoBank had in enforcing the loan documents.  See Padilla v. Ghuman, 183 P.3d 653, 659 (Colo. App. 2007).

---

[8]Thereafter, the confirmed plan provided that LTI's allowed secured claim would accrue interest at the rate of 6%.

18

Under Colorado law, the terms of a contract generally reflect the intent of the parties and should be enforced.  See, e.g., Estates in Eagle Ridge, LLLP v. Valley Bank & Trust, 141 P.3d 838, 842 (Colo. App. 2005).  When the terms are ambiguous, extrinsic evidence can be considered:

> A contract must be construed to ascertain and effectuate the intent of the parties, as expressed in the contract itself. . . . Should the language of the contract be ambiguous, lending itself to more than one reasonable interpretation, extrinsic evidence of the intent of the parties may be helpful in resolving the ambiguity. . . .  Although we have noted that in construing contracts, as distinguished from statutes or rules having general applicability, it may be appropriate to look beyond the "four corners" of the document and consider context and surrounding circumstances, not only for resolving ambiguity but even for determining whether it exists, we have always made clear that extrinsic evidence of intent can never contradict or change the language of a contract or justify an interpretation not reasonably derivable from the contract itself.

Fort Lyon Canal Co. v. High Plains A & M, LLC, 167 P.3d 726, 728-729 (Colo. 2007).  "In determining whether the language of a contract is ambiguous, a court should construe the terms according to the plain and generally accepted meaning of the words, with reference made to all provisions of the agreement."  Bauer Development Co. v. Nu-West, Inc., 757 P.2d 1149, 1151 (Colo. App. 1988).  And when, upon consideration of the contract and any relevant extrinsic evidence, the intent of the parties is still in doubt, "a contract is construed most strongly against the drafter."  Cheyenne Mountain School Dist. No. 12 v. Thompson, 861 P.2d 711 (Colo. 1993); see also Bauer Development Co. v. Nu-West, Inc., 757 P.2d at 1151.

Furthermore, Colorado permits parties to commercial loan agreements to "stipulate to a higher default interest rate when a loan is not paid off according to its

19

terms." <u>Dikeou v. Dikeou</u>, 928 P.2d 1286, 1290 (Colo. 1997).  To the extent that the loan

agreement required the lender to take affirmative action to charge a default interest rate,

the lender must "perform some clear, unequivocal affirmative act evidencing" its election

to begin charging a default interest rate.  <u>See</u> <u>Padilla v. Ghuman</u>, 183 P.3d at 659-60.

Similarly, "[a]cceleration clauses premised upon default in payment are

enforceable." <u>Bauer Development Co. v. Nu-West, Inc.</u>, 757 P.2d at 1150.  "In the case

of an acceleration provision exercisable at the option of the obligee, the obligee must

perform some clear, unequivocal affirmative act evidencing his intention to take

advantage of the accelerating provision." <u>Id.</u>, 757 P.2d at 1150; <u>see</u> <u>also</u> <u>Padilla v.

Ghuman</u>, 183 P.3d at 659.


D.


Upon my review of the loan documents, certain relevant provisions are

quite clear.  First, under the MLA § 10(D)(iii), to the extent that there was an unpaid

balance of the loan upon maturity, the unpaid balance accrued interest at the National

Variable Rate plus 4%.  Second, in April 2003 when the Co-Borrowers failed to tender

the requisite loan payment, an event of default occurred under MLA § 9(A).  Third,

pursuant to MLA First Supplement § 5, upon an event of default the Co-Borrowers had

no option to choose any interest rate other than the Weekly Variable Rate option.

Moreover, the Weekly Variable Rate option is set at the "sole and absolute discretion" of

CoBank, but may not exceed the National Variable Rate.  <u>See</u> MLA First Supplement § 5.


20

But the parties disagree as to the meaning of several other provisions.  For example, LTI maintains that the provision of MLA § 10—stating if the Co-Borrowers are in default of the "Insolvency" provisions of MLA § 9(H), then the loan balance became automatically accelerated without the need for any notice—is also clear and unambiguous.  But the debtors emphasize that this same provision also provides that upon the occurrence of <u>any</u> event of default, presumably one under § 9(H), CoBank "may, upon notice to the Co-Borrowers" take certain actions, including acceleration and enforcement.

Similarly, LTI contends that MLA § 10(D)(i) is clear.  That provision provided CoBank with the option to charge a 4% default rate in addition to the National Variable Rate when the CoBorrowers fail to "make any payment when due."  The debtors counter that MLA § 10(D)(ii) states that upon an event of default, CoBank had the option to charge a default rate of only 2% upon the rate "otherwise applicable thereto."  In essence, the debtors argue MLA § 10(D) ambiguously provides CoBank with the right to charge a 4% default rate in addition to the National Variable Rate under subparagraph (i), but limits it to a 2% default rate in addition to the applicable interest rate—which the debtors maintain is the Weekly Variable Rate—under subparagraph (ii), whenever the event of default arises, including a default for nonpayment.   As CoBank did not calculate any Weekly Variable Rate after the debtor's default in April 2003, the debtors argue that the Weekly Variable Rate charged to SCCCC, LP should be used.

The debtors also note that MLA § 10(D)(i) contains the phrase "in each instance," which they interpret as requiring that CoBank exercise its rights under that subparagraph every time the Co-Borrowers default in tendering a required payment, while subparagraph (ii) applies during the continuance of any event of default.  And the debtors

21

also assert that the phrase in MLA § 10(D)(ii), referring to interest upon the "unpaid balances," limits the accrual of interest solely to the amounts past due and not to the entire principal balance of the loan.

Finally, LTI argues, and the debtors disagree, that in April 2003 and thereafter the debtors were insolvent within the meaning of MLA § 9(H).  If so, then LTI maintains that CoBank had no obligation to provide notice to the Co-Borrowers that it had elected to accelerate the loan balance, and the entire balance was then due and payable.  And if the entire loan balance was accelerated, then CoBank was entitled to apply the default interest rate against the entire outstanding loan balance under MLA § 10(D)(iii).

E.

As quoted earlier, MLA § 10 gave CoBank (and so its assignee, LTI) the option, upon notice to the Co-Borrowers, to accelerate the loan and thereby declare the entire principal balance and accrued interest immediately due and payable in the event of a loan default.  There is no evidence that either CoBank or LTI provided such notice to the debtors.  The May 2003 letter expressly and only refers to the "loan agreement . . . being charged the default rate of interest for non-payment . . . effective April 22, 2003." Ex. D-6.  Nor can the invoices sent to the Co-Borrowers be construed as implicitly providing such notice of acceleration, as no demand for the entire principal balance is included in any such invoice.  Moreover, LTI has stipulated that it never provided notice

22

of acceleration to the debtors.  Therefore, unless the loan documents provide an exception

to the notice requirement, the Co-Borrower loans were never accelerated.

LTI emphasizes that such an exception is found within the introductory

paragraph to MLA § 10 itself, as it provides that acceleration of the entire principal

balance occurs upon an event of default arising under MLA § 9(H).  The latter is the

"insolvency" provision.   As quoted above, MLA § 9(H) states:

> (H) Insolvency, Etc. Any Co-Borrower or any of its
> subsidiaries should: (i) become insolvent or should generally
> not, or should be unable to, or should admit in writing its
> inability to, pay its debts as they come due; or (ii) suspend its
> business operations or a material part thereof or make an
> assignment for the benefit of creditors; or (iii) apply for,
> consent to, or acquiesce in the appointment of a trustee,
> receiver, or other custodian for it or any of its property or, in
> the absence of such application, consent, or acquiescence, a
> trustee, receiver, or other custodian is so appointed; or (iv)
> commence or have commenced against it any proceeding
> under any bankruptcy, reorganization, arrangement,
> readjustment of debt, dissolution, or liquidation Law of any
> jurisdiction, which, in the case of a proceeding commenced
> against any Co-Borrower or any of its subsidiaries, is not
> dismissed within 45 days.

LTI maintains that the debtors were insolvent within the meaning of § 9(H) in April 2003,

and therefore the Co-Borrower loan was automatically accelerated.  As will be discussed,

I find that LTI has not demonstrated that the Co-Borrowers were in default under § 9(H).[9]

LTI does not contend that the provisions of subparagraphs 9(H)(ii)-(iv) are

germane.  The debtors, Investments and Equity, whose sole business involved their

investment and activities as limited and general partner of SCCCC, LP, continued those

activities after April 2003.  Thus, there was no suspension or cessation of their business

_____

[9]Thus, I do not need to consider the debtors' argument that MLA § 10 requires
notification of acceleration even in the event of insolvency.

activities.  No bankruptcy petitions were filed until after the loan matured in 2009; no trustee, receiver, custodian, or assignment for the benefit of creditors was appointed. Accordingly, LTI focuses upon the language found in § 9(H)(i).  Written in the disjunctive, this subparagraph declares an event of default if either Co-Borrower became "insolvent or should generally not, or should be unable to, or should admit in writing its inability to, pay its debts as they come due."

The Colorado Uniform Commercial Code defines insolvency:

(22) An "insolvent" person is a person that:

(A) Has generally ceased to pay debts in the ordinary course of business other than as a result of a bona fide dispute as to the debts;

(B) Is unable to pay debts as they become due; or

(C) Is insolvent within the meaning of federal bankruptcy law.

C.R.S.A. § 4-1-201.  In addition, C.R.S.A. § 7-106-401(3) prohibits a corporation from making shareholder distributions whenever:

(a) The corporation would not be able to pay its debts as they become due in the usual course of business; or

(b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

Similarly, for fraudulent transfer purposes under Colorado law:

(1) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(2) A debtor who is generally not paying his debts as they become due is presumed to be insolvent.

24

C.R.S.A. § 38-8-103.

These statutory definitions of insolvency are largely consistent with Colorado common law, which recognizes two types of insolvency: "balance sheet insolvency," when liabilities exceed assets, and "equity insolvency," when the entity is generally unable to pay its debts as they come due. See generally Glenn Justice Mortg. Co., Inc. v. First Nat. Bank of Fort Collins, 592 F.2d 567, 572-73 (10th Cir. 1979); McCallum Family L.L.C. v. Winger, 221 P.3d 69, 80 (Colo. Apps. 2009). Moreover, the balance sheet test is used to define insolvency under federal bankruptcy law, see 11 U.S.C. § 101(32), while equity insolvency is used to determine whether an involuntary bankruptcy petition should be granted under 11 U.S.C. § 303(h)(1). Indeed, Colorado state courts have relied upon federal court decisions applying section 303(h)(1) of the Bankruptcy Code, as this statutory provision is "virtually identical" to the "equity insolvency test" found in Colorado statutes and common law. See Paratransit Risk Retention Group Ins. Co. v. Kamins, 160 P.3d 307, 315-16 (Colo. App. 2007).

Interpreting MLA § 9(H)(i) against this backdrop, I conclude that subparagraph (i) was intended by the parties to cover both balance sheet (assets compared with liabilities) as well equity ("generally not, or should be unable to . . . pay its debts as they come due") insolvency. Furthermore, LTI had the evidentiary burden to establish that the Co-Borrowers had committed an event of default under MLA § 9(H). See generally Schempp v. Lucre Management Group, LLC, 75 P.3d 1157, 1163 (Colo. App. 2003) (plaintiff failed to prove that defendant was insolvent to recover a transfer as fraudulent); Bauer Development Co. v. Nu-West, Inc. (lender must demonstrate compliance with the requisite provisions of loan documents before default may be

25

asserted).  For the following reasons, LTI failed to meet its burden to demonstrate that the

Co-Borrowers were in default under MLA § 9(H)(i) in April 2003 (or at any time prior to

loan maturity).

       The evidence demonstrated that the debtors' sole assets in April 2003 were

their interests in SCCCC, LP and their participation certificates in CoBank.  LTI

acknowledges that in January 2009, when the debtors filed their voluntary bankruptcy

petitions, the value of their interests in the limited partnership exceeded LTI's secured

claim, then asserted to be in excess of $13.5 million.  In April 2003, presumably the value

of SCCCC, LP, and the debtors' interests therein, would have been less than it was in

January 2009; however, so was their obligation then owed to CoBank.

       There was no evidence offered that would suggest that the Co-Borrowers'

assets were less than their liabilities in April 2003 or any date thereafter.  Indeed, if the

value of the Co-Borrowers' interests in the limited partnership was less than the amount

borrowed from CoBank, then the debtors may have been in default from the inception of

the loan, as those partnership interests were essentially their only assets.  However,

CoBank, which was entitled to receive periodic financial reports concerning the limited

partnership, never so concluded.  When CoBank sent its letter of default in May 2003, it

only made reference to the debtors' failure to pay principal and interest then due and not

to insolvency: "your loan agreement . . . is being charged the default rate of interest for

non-payment, as defined in the loan agreement . . . ."  Ex. D-6.  Moreover, CoBank

understood that the Co-Borrowers were using loan funds to invest in the limited

partnership.  It is unlikely that CoBank would have approved such loans if it believed that

the partnership interests obtained thereby were worth less than the amounts borrowed.

Therefore, LTI has not demonstrated that the Co-Borrowers were "insolvent" on a balance sheet basis under MLA § 9(H)(i).

In support of its position that the Co-Borrowers were indeed in default under this subparagraph, LTI primarily argues that the debtors were generally not paying, or were generally unable to pay their debts as they came due: viz., that they were equitably insolvent. The fact that they failed to tender payments to CoBank after April 2003 does not, by itself, meet LTI's burden of persuasion on this point. See Schempp v. Lucre Management Group, LLC, 75 P.3d at 1164:

> Indeed, there was evidence that Schaal failed to honor checks of $650,000 and $60,000, did not pay taxes as they became due, allowed property belonging to his partnership to be foreclosed on, and had outstanding loans he was not paying. However, as the trial court found, there was evidence that Schaal had significant assets in Colorado and in other states and foreign countries. The court obviously inferred that, given the widespread nature and extent of Schaal's assets, evidence of failure to pay some debts was not sufficient to prove that he was "generally not paying his debts." Accordingly, this finding was not clearly erroneous.

A similar interpretation was reached by the Ninth Circuit Court of Appeals in construing section 303(h)(1) of the Bankruptcy Code:

> A finding that a debtor is generally not paying its debts "requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts." In re Dill, 731 F.2d 629, 632 (9th Cir. 1984).

In re Vortex Fishing Systems, Inc., 277 F.3d 1057, 1072 (9th Cir. 2002).

Indeed, in Paratransit Risk Retention Group Ins. Co. v. Kamins, the Colorado Court of Appeals relied upon bankruptcy court decisions that considered whether a person was equitably insolvent within the meaning of 11 U.S.C. § 303(h)(1):

27

Federal bankruptcy courts have looked at the following
factors in determining whether a corporation is generally not
paying its debts as they become due in the regular course of
business: (1) the number of debts unpaid each month
compared to those that are paid; (2) the amount of the
delinquency; (3) the materiality of the nonpayment; and (4)
the nature of the debtor's conduct of its financial affairs. . . .

A bankruptcy court has explained that:

> [i]n the final analysis, the determination
> whether an alleged debtor is generally not
> paying his or her debts as they become due is a
> flexible one which admits "no hard and fast
> rules," and requires a careful balancing of both
> the number and amount of the unpaid debts, in
> proportional terms, viewed in the light of the
> alleged debtor's total financial picture.

In re Fischer, 202 B.R. 341, 350 (Bankr. E.D.N.Y. 1996)
(citations omitted).

160 P.3d at 316 (citations omitted); see also In re H.I.J.R. Properties Denver, 115 B.R.

275, 277 (D. Colo. 1990):

> Although the phrase "generally not paying such debtor's debts
> as such debts become due" is not defined in the [Bankruptcy]
> Code or illuminated by its legislative history . . . , courts have
> looked to the "totality of the circumstances existing when the
> petition [was] filed."  Hays v. Rewald (In re Bishop, Baldwin,
> Rewald, Dillingham & Wong), 779 F.2d 471, 475 (9th Cir.
> 1985).  In particular, they have focused on the number of the
> debts, the amount of the delinquency, the materiality of
> nonpayment and the nature of the debtor's conduct of his
> financial affairs.

As the debtors observe, the record made at the hearing does not reveal the

debtors' total financial picture in April 2003 or at any time prior to January 2009, when

they filed their bankruptcy petitions.  Consideration of their bankruptcy schedules and the

proof of claims register via judicial notice,[10] see generally In re Indian Palms Associates,

Ltd., 61 F.3d 197 (3d Cir. 1995), reveals only that minimal unsecured proofs of claims

were filed by the Internal Revenue Service for calendar year 2008, by the debtors'

accounting firm, and by the Commonwealth of Pennsylvania (for an unstated tax period)

and insider claims.  As these claims are minimal, presumably these categories of expenses

were paid by the debtors to a large extent between April 2003 and January 2009.

Moreover, the financial circumstance of the limited partnership, and its ability to make

distributions to the debtors as limited partners in April 2003 and prior to the debtors'

bankruptcy filings in January 2009 is unknown on this evidentiary record.  That is, to

what extent did the debtors' failure to pay CoBank stem from decisions made by the

general partner of the limited partnership concerning retention of earnings, to which the

limited partners acquiesced?  That issue was alluded to by Ms. Copp when questioned by

LTI's counsel:

> Q. Would you agree with me that the LLCs have no source of
> income other than distributions from the LP?
>
> A. Yes.
>
>              ***
>
> Q. Did the LP make any distributions to the LLCs during
> 2003?
>
> A. Yes, just in January.
>
> Q. Did the LLCs, excuse me, were the LLCs financially able
> to make the payments due to CoBank in April of 2003?
>
> A. They were not.
>
> Q. Did the LLCs make any distributions to members in 2003?

---

[10]Fed. R. Evid. 201 is incorporated into bankruptcy cases by Fed. R. Bankr. P.
9017.

A. I don't believe they did, no.

Q. Did the LLCs, at any time, post-April, 2003, have sufficient funds to pay back CoBank under any calculation that we've heard discussed today.

A. Well, there's no contemplation of that.

Q. Now, that's not my question.  My question is, under any of the scenarios of calculations of interest that you've heard discussed today, did the LLCs have the money necessary, under any of them, to pay back CoBank?

A. The LLCs potentially could have had money to repay CoBank.

Q. That's not my question.  My question is did the LLCs have the funds, under any of the scenarios to pay CoBank?

***

The Court: Did you understand the question?

The Witness: Yes, I do. They did not.

N.T., at 73-74.

Clearly, the debtors did not tender payments to CoBank or to LTI after April 2003.  It is "speculation and conjecture only," however, to conclude that they were generally not paying or were unable to pay their debts as they came due without further evidence concerning the financial circumstances of SCCCC, LP (and possibly SCTC).  Perhaps SCCCC, LP retained earnings that, had they been distributed to limited partners, would have allowed the Co-Borrowers to repay CoBank.[11]  See Glenn Justice Mortg. Co., Inc. v. First Nat. Bank of Fort Collins, 592 F.2d at 573; Schempp v. Lucre Management

---

[11]For example, debtor Equity scheduled SCCCC, LP as having loaned it almost $350,000 and limited partner SCTC having loaned it about $112,000.  See docket entry #320 (amended Schedule F for Equity).  Given the affiliation of these entities and the debtors, it is unknown whether the debtors could have obtained additional funds from either of these entities to be used to repay CoBank and/or LTI as payments became due.

30

<u>Group, LLC</u>, 75 P.3d at 1164.  Therefore, LTI has not met its evidentiary burden to prove an insolvency default on the part of the Co-Borrowers in April 2003 (or prior to loan maturity).


F.


Therefore, as neither CoBank nor LTI ever provided notice under MLA § 10 that the Co-Borrower loan was accelerated, <u>see</u> <u>Bauer Development Co. v. Nu-West, Inc.</u>, and as there was insufficient evidence to conclude that the Co-Borrowers were in default of the loan agreements under MLA § 9(H), the debtors' current obligation to repay LTI as assignee from CoBank must be determined by computing the accrued interest on the basis that the entire loan balance only became due and payable on its maturity date: January 20, 2009.

As noted earlier, MLA § 10(D) contained three subparagraphs involving default rates of interest.  Subparagraph (i) permitted CoBank, at its option and upon the failure of the Co-Borrowers to tender a required principal reduction payment, to assess interest on each missed principal payment at the default rate of 4% plus NVAR. Subparagraph (ii) permitted CoBank, at its option and upon any event of default, to assess a default rate of 2% plus "the rate otherwise applicable" to the unpaid loan balance. Finally, subparagraph (iii) stated that after loan maturity, "whether by reason of acceleration or otherwise, the unpaid loan balance shall automatically bear interest at 4% per annum in excess of CoBank's" NVAR.

31

As no loan acceleration occurred for reasons just stated, the provisions of subparagraph (iii) only became effective on January 20, 2009, when the loan was to have been repaid.  Prior to that date, based upon the language in its May 2003 notice to the Co-Borrowers, I conclude that CoBank elected to proceed under subparagraph (i).

The relevant language of that notice to the Co-Borrowers, dated May 1, 2003, reads:

> Additionally, this letter constitutes official notification that your loan agreement MLA No. 0813 is being charged the default rate of interest for non-payment, as defined in the loan agreement, effective April 22, 2003.

Thereafter, CoBank invoiced the Co-Borrowers for accrued interest based upon its NVAR and a default rate of 5.62%.[12]

Given the language of the default notice, as well as the interest rate charged in subsequent invoices, I conclude that CoBank had the right to demand and then (inartfully) exercised that right, see Padilla v. Ghuman, 183 P.3d at 660, to receive default interest at the maximum rate of NVAR plus 4% pursuant to MLA § 10(D)(i).  LTI does not contend that CoBank exercised its option under subparagraph (ii).  Nor does it maintain that CoBank had the right to apply subparagraph (ii) cumulatively with either subparagraphs (i) or (iii).  The debtors' argument that, by charging an excessive interest rate, CoBank forfeited its contractual rights under § 10(D)(i) is unpersuasive.  The appropriate remedy is to compute the amount owed using the correct interest rate.[13]  See

---

[12]No explanation was offered for CoBank's charging NVAR plus 5.62%.

[13]Similarly, the debtors' current challenge to the interest rate used by CoBank and LTI is not precluded by their apparent lack of protest upon receipt of the invoices with the incorrect interest rate.

generally Brown v. Fenner, 757 P.2d 184 (Colo. App. 1988) (usurious interest rate is reduced to the highest permissible rate).

I agree with the debtors, though, that the default interest under § 10(D)(i) applies only to the quarterly principal payments as they became due and were unpaid. Once the loan matured in January 2009, the parties intended that MLA § 10(D)(iii) apply, permitting a default rate of NVAR plus 4% on the entire outstanding loan balance.

I also conclude that the MLA and its First Supplement reflect an intention by the parties that, upon election by CoBank of its remedy under § 10(D)(i), a non-default rate of interest would accrue on the portion of the loan balance for which quarterly principal reduction payments were not required. In other words, as the unpaid quarterly principal payments increased after April 2003, their total is subtracted from the overall principal loan balance. The result represents a declining portion of the loan principal to which the relevant non-default rate applied. That interest rate was intended under the MLA Supplement to be the Weekly Variable Rate.

I disagree, however, with the debtors' contention that the Weekly Variable Rate should be based upon the rate charged by CoBank to SCCCC, LP. Clearly, this interest rate, which was to be fixed by CoBank in its discretion, would be based upon the financial condition of each particular borrower, and so must take into account that the Co-Borrowers were in non-payment default. As the Weekly Variable Rate was capped by the NVAR, and given the payment invoices sent to the Co-Borrowers, I conclude that CoBank intended to, gave suffici and had the right to charge the highest default rate permissible under the loan documents: viz., the NVAR on that portion of the loan balance principal that was not due to be paid quarterly.

33

Insofar as the relevant interest rate post-bankruptcy is concerned, the

debtors concede that LTI is an oversecured creditor entitled to postpetition interest under

section 506(b).  As I previously observed when considering confirmation of the debtors'

jointly proposed plan:

> During the postpetition, pre-effective date period, most courts
> will award interest under section 506(b) at the contract rate to
> an oversecured creditor, which interest may include a default
> rate.  See Matter of Southland Corp., 160 F.3d 1054 (5th
> Cir.1998); In re Nixon, 400 B.R. 27 (Bankr. E.D. Pa. 2008); 3
> Norton Bankr.Law & Practice 3d, § 52:11 (2010); but see In
> re Milham, 141 F.3d at 423 ("Most courts have awarded
> pendency interest at the contractual rate; but nevertheless,
> however widespread this practice may be, it [section 506(b)]
> does not reflect an entitlement to interest at the contractual
> rate.").

In re South Canaan Cellular Investments, Inc., 427 B.R. 44, 77 (Bankr. E.D. Pa. 2010);

see also 4 Collier on Bankruptcy, ¶ 506.04[2][b][ii] (16th ed. 2010) ("In general, just as

there is no express mechanism in section 506(b) for adjusting basic interest rates, courts

should be reluctant to infer a mechanism for disallowing default rates of interest under

federal law.  Rather, the allowability of the rate should turn instead on applicable

nonbankruptcy law.").

In this adversary proceeding, the loan agreement expressly provided for the

application of default interest after maturity.  Colorado law would enforce such a

provision.  Other than arguing unpersuasively that the MLA does not clearly provide for

default interest, the debtors offer no reason that this interest rate should not be applied

under section 506(b) on the facts presented: i.e., the loan has matured and the MLA

provides for a higher rate of interest if the loan has not been repaid in full upon maturity.

See In re ACA Real Estate LLC, 418 B.R. 155, 159-60 (M.D.N.C. 2009) ("[T]here is a

34

presumption in favor of the contractual default rate subject to rebuttal based upon equitable considerations."); see also In re La Guardia Associates, L.P., 2006 WL 6601650 (Bankr. E.D. Pa. 2006) (concluding that certain equitable considerations justified not applying the contractual default interest rate).  Accordingly, between the commencement of these chapter 11 cases on January 25, 2009 and the effective date of the confirmed plan, May 7, 2010, LTI's allowed secured claim will include interest at the rate of NVAR plus 4%.

Finally, as mentioned earlier, the loan agreements did not provide for compounding of accrued interest.  And interest under the terms of the confirmed chapter 11 plan accrues after May 7, 2010 at the rate of 6% until the allowed secured claim in repaid.

Therefore, based upon the computations attached to this memorandum as Appendix 1, I conclude that as of January 25, 2009, the date of the debtors' bankruptcy filings, LTI held an allowed secured claim for principal and interest in the amount of $10,403,509.43.[14]  As of the effective date of the joint confirmed plan, May 7, 2010, postpetition interest increased that allowed claim by $703,485.69 to $11,107,856.71.

IV.

LTI also demands that attorneys' fees and expenses under section 506(b) be included in its allowed secured claim, along with the aforementioned principal and

---

[14]The "total prepetition interest" amount in Appendix 1 includes the interest accrued prior to April 22, 2003.

accrued interest.  Because an award under section 506(b) may reduce distributions made

to other creditors and equity holders, a secured creditor seeking allowance of postpetition

fees (and expenses) under section 506(b) "bears the burden of proving entitlement by

establishing: (1) that it is oversecured in excess of the fees requested; (2) that the fees are

reasonable; and (3) that the agreement giving rise to the claim provides for attorney fees."

In re McGuier, 346 B.R. 151, 158 (Bankr. W.D. Pa. 2006); see also In re Kord

Enterprises II, 139 F.3d 684, 689 (9th Cir. 1998).  If LTI can establish these three

elements, its allowed secured claim will include postpetition counsel fees and expenses.

See, e.g., In re Joubert, 411 F.3d 452, 454 (3d Cir. 2005) ("Section 506(b) allows

oversecured creditors to add reasonable post-petition, pre-confirmation attorney fees,

interest, and costs to the amount of their secured claim.").

     As for the first element, the debtors concede that LTI is an oversecured

creditor.  Insofar as the third element is concerned, various loan documents contain

contractual fee-shifting provisions.  For example, the Security Agreements signed by the

debtors contains a provision in §8(B) that reasonable attorneys' fees and expenses for,

inter alia, "enforcement of any of the Secured Party's rights or remedies hereunder"

"become part of the Obligations secured hereby and be paid by Debtor on demand."  The

promissory note similarly stated:

> Should this note be placed in the hands of an attorney for
> collection or the services of any attorney become necessary in
> connection with enforcing its provisions, the undersigned
> agrees to pay reasonable attorneys' fees, together with all
> costs and expenses incident thereto, to the extent allowed by
> law.

     In addition, the Partnership Interests Pledge Agreements provided in section

9(C) that:

36

Pledgor shall reimburse Secured Party for all of Secured
Party's expenses incurred in connection with all reasonable
costs and expenses incurred by Secured Party (including
attorneys' fees and disbursements) to: (i) commence, defend
or intervene in any court proceeding relating to the Collateral
or this Pledge Agreement; (ii) file a petition, complaint,
answer, motion or other pleadings, or to take any other action
in or with respect to any suit or proceeding (bankruptcy or
otherwise) relating to the Collateral or this Pledge Agreement;
(iii) protect, collect, lease, sell, or liquidate any of the
Collateral; or (iv) attempt to enforce any security interest in
any of the Collateral or to seek any advice with respect to
such enforcement.

The security agreements governed non-partnership assets owned by the

debtors.  Each pledge agreement provided a security interest in the limited partnership

interest owned by the pledgor.  Thus, the promissory note, security agreements and pledge

agreements provided for CoBank to be reimbursed reasonable attorneys' fees and

expenses insofar as it sought to enforce its rights under those particular documents.  The

MLA, however, contained a broader fee provision.  Specifically, the MLA § 15 stated:

To the extent allowed by law, the Co-Borrowers agree to pay
all reasonable out-of-pocket costs and expenses (including the
fees and expenses of counsel retained by CoBank) incurred by
CoBank in connection with the origination, negotiation,
documentation, administration, collection, and enforcement of
this Agreement and the other Loan Documents, including,
without limitation, all costs and expenses incurred in
perfecting, maintaining, determining the priority of, and
releasing any security for the Co-Borrower's obligations to
CoBank, and any stamp, intangible transfer or like tax payable
in connection with this Agreement or any other Loan
Document or the recording hereof or thereof.

37

(Emphasis added).[15]  Section 3 of the MLA defines "Loan Documents" as the MLA,

"each Supplement, the Notes and all security and other instruments and documents

relating hereto and thereto."

Thus, the fee-shifting provision in the MLA covers collection and

enforcement actions related to other "loan documents," such as the pledge agreements.

That broader provision is relevant in this proceeding because CoBank received a pledge

agreement from non-debtor SCTC of its limited partnership interest.  SCTC was not an

obligor on any promissory note to CoBank, nor did it provide CoBank with a general

security agreement.  SCTC did, however, provide CoBank with a security interest in its

limited partnership interest in SCCCC, LP to serve as additional collateral for the loan

made to the Co-Borrowers.

In January 2009, just prior to the debtors' commencement of their chapter

11 cases, LTI commenced litigation in Colorado state court against the debtors and

SCTC.  The litigation against the debtors was stayed by their bankruptcy filings pursuant

to 11 U.S.C. § 362(a).  The litigation against SCTC was not stayed.  In Colorado state

court, LTI is seeking a declaration pursuant to the SCTC pledge agreement that it now

controls SCTC's partnership interest, owing to the debtors' default in loan payments.

In this adversary proceeding, LTI seeks an allowance of counsel fees in

connection with the state court litigation against SCTC.  One issue raised by the debtors'

objection to LTI's allowed secured claim under section 506(b) is whether LTI is entitled

to be paid such counsel fees from the debtors' bankruptcy estate for legal services

---

[15]In their post-trial memorandum, at 17, the debtors quote a portion of  MLA § 15,
but omit the phrase "and the other Loan Documents."

provided in the Colorado state court litigation against non-debtor SCTC.  In addition, to

the extent that LTI has a contractual right to counsel fees from the debtors, there is

considerable disagreement between the debtors and LTI as to the amount of fees incurred

by LTI that were reasonable.

   In determining appropriate counsel fees under section 506(b), "the proper

methodology . . . is the lodestar approach, i.e., multiplying the total number of hours

reasonably expended by the reasonable hourly rate."  In re Nixon  400 B.R. 27, 38 (Bankr.

E.D. Pa. 2008), aff'd, 2009 WL 1845229 (E.D. Pa. 2009).  In this adversary proceeding,

the debtors do not challenge the hourly rates used by LTI's various counsel.  Instead, they

vigorously assert that many of the services rendered by counsel were unnecessary,

duplicative, or of little or no value to LTI.

   In general, "reasonableness" of counsel fees requires consideration of "(i)

the nature of the services, (ii) the extent of the services, (iii) the value of the services, (iv)

the time spent on the services, and (v) the cost of comparable services in non-bankruptcy

cases."  In re Busy Beaver Building Centers, Inc., 19 F.3d 833, 840 (3d Cir. 1994).  When

an oversecured creditor seeks allowance of counsel fees under section 506(b), the focus

of reasonableness is whether the services rendered to the creditor were in furtherance of

enforcement or protection of the creditor's secured claim or its collateral.  See generally

In re McGuier,  346 B.R. at 162-63.  Thus, a bankruptcy appellate panel has observed:

> Section 506(b) requires that such [attorneys'] fees and costs
> be "reasonable".  Reasonableness embodies a range of human
> conduct.  The key determinant is whether the creditor incurred
> expenses and fees that fall within the scope of the fees
> provision in the agreement, and took the kinds of actions that
> similarly situated creditors might reasonably conclude should
> be taken, or whether such actions and fees were so clearly
> outside the range as to be deemed unreasonable.  The

39

> bankruptcy court should inquire whether, considering all
> relevant factors including duplication, the creditor reasonably
> believed that the services employed were necessary to protect
> his interests in the debtor's property.

In re Dalessio, 74 B.R. 721, 723 (B.A.P. 9th Cir. 1987); accord In re F.B.F. Industries,

Inc., 1995 WL 691893, at *4 (Bankr. E.D. Pa. 1995).

LTI has the burden of persuasion to demonstrate the reasonableness of costs

and fees it seeks to charge the debtors' estates.  In meeting its evidentiary burden, the

secured creditor

> . . . is required to show "reasonableness" by a preponderance
> of the evidence, and among other things, by providing the
> court with detailed descriptions of the services rendered,
> supporting documentation, as well as any appropriate, other
> evidence necessary for the Court to make a favorable
> determination on the application for payment. . . .  The
> creditor must also show by a preponderance of the evidence
> that the fees were necessary to protect the creditor's interests.

In re McGuier, 346 B.R. at 158 (citations omitted).

In addition, as a district court judge has observed:

> An oversecured creditor cannot recover attorneys' fees for
> every action it takes by claiming that its rights have been
> affected. . . .  Moreover, it is similarly unreasonable to ask the
> debtor to reimburse the oversecured creditor for attorneys'
> fees generated from unnecessary or redundant tasks. . . .  A
> bankruptcy court's determination of the reasonableness of
> attorneys' fees and costs under § 506(b) is committed to the
> Bankruptcy Court's discretion and is to be determined on a
> case by case basis.

In re F.B.F. Industries, Inc., 1995 WL 581935, at *1 (E.D. Pa. 1995) (citations omitted);

accord In re McGuier, 346 B.R. at 164-65:

> What is ultimately approved by the Court as reasonable and
> necessary does not necessarily equate to the same fees
> charged (and paid) between the attorney and the attorney's
> client.  Such a fee is a contractual matter between the two.  In

40

the bankruptcy context, the allowed fees may be subject to
variation where creditors' and debtors' funds are being
disbursed to pay secured creditor claims. . . . The bankruptcy
court enjoys very broad discretion in determining the
necessity and reasonableness of attorney fees claimed by an
oversecured creditor. . . . In determining reasonableness,
courts require fee applications to contain a certain level of
content and specificity. . . . Unitemized disbursements for
services "lumped" or "bundled" together in a single entry
thereby inhibiting the Court from determining the
reasonableness of the individual services rendered and the
necessity/value of the service to the estate is a practice
universally disallowed. . . . While oversecured creditors are
entitled to engage counsel and pay for constant,
comprehensive and aggressive representation, such creditor is
not entitled to reimbursement for attorney fees for every
action it takes claiming that its rights or interests have been
affected. Where services are not reasonably necessary to
protect its interests, or where action is taken because of a
lawyer's excessive caution or overzealous advocacy, in
exercise of their discretion, courts have the right and are
duty-bound to disallow the fees and costs requested. . . . An
oversecured creditor should not be given a "blank check" to
incur attorney fees and costs with the expectation it will
automatically be reimbursed for those fees and costs out of its
collateral. . . . Finally, where the evidentiary record is
inadequate, the reviewing court has authority to make an
appropriate award without further pleadings or evidence,
relying on its own knowledge and experience in determining
reasonable and proper fee awards.

(Citations omitted).

V.

A.

LTI has submitted time records from three law firms that have represented

its interest as a secured creditor. Those firms—Sander Ingebretsen & Wake P.C., Vuono

& Gray, LLC, and Reger Rizzo & Darnell LLP—collectively billed for 5,413.25 hours in

representing LTI's interests from February 2008 through April 2010.  Essentially, this

representation encompassed analysis of LTI's rights under the CoBank loan documents,

negotiations with the Co-Borrowers to collect on the CoBank note after assignment in

October 2007, litigation in Colorado state court, primarily against non-debtor SCTC, and

participation in numerous aspects of the debtors' chapter 11 cases.  The aggregate amount

of fees sought by LTI for such services is $1,353,109.50, plus expenses.

   The debtors contend that all legal fees incurred by LTI in its Colorado

litigation against SCTC, provided by the Sander and Vuono law firms (and the Reger law

firm to a small extent), fall outside the scope of section 506(b).  They contend that

because this state court litigation was stayed as to them, it would be unfair to diminish

their bankruptcy estates to pay for litigation against a non-debtor, and LTI should not

have continued prosecuting this litigation when "it was reasonably certain that its claim

would be paid in full."  Debtors' Post-Trial Memorandum, at 29.

   For the following reasons, I agree with LTI that the debtors' broad

objection to reimbursing LTI for any fees incurred in the Colorado state court litigation as

outside the scope of their contractual agreements is unpersuasive.

   As mentioned above, in the MLA the Co-Borrowers agreed to reimburse

CoBank (predecessor in interest to LTI) for reasonable counsel fees and costs incurred in

the enforcement of the lender's rights under any of the various loan documents.  The

SCTC pledge agreement, which provided additional loan collateral, is among those loan

documents.  Courts have held that an oversecured creditor can properly seek

reimbursement of counsel fees under section 506(b) for enforcement actions taken against

non-debtors to the extent provided by a prepetition agreement entered into by the debtor. See, e.g., In re Hassen Imports Partnership, 256 B.R. 916, 925-26 (B.A.P. 9th Cir. 2000); In re Hyer, 171 B.R. 67, 71 (Bankr. W.D. Mo. 1994). Moreover, as the default that triggered this state court litigation was the failure of the debtors to repay the Co-Borrower loan, it is more equitable for the debtors' equity holders to pay such an expense than for SCTC's equity holders.

Furthermore, as I noted in connection with confirmation of the debtors' proposed joint plan, SCTC's limited partnership interest, when added to the debtors' limited partnership interests, totals 51%. See In re South Canaan Cellular Investments, Inc., 427 B.R. 44, 50 (Bankr. E.D. Pa. 2010). Thus, the ability to control this partnership interest in the event of loan default would be important to any lender concerned about control over the limited partnership; and repayment of the CoBank loan was always connected to the limited partnership.

Despite the debtors' promise in their proposed chapter 11 plans, including the plan confirmed, to repay LTI its allowed secured claim, that claim has not yet been repaid and it is not absolutely certain that it will be. LTI is likely to be repaid in full under the confirmed plan from the sale either of the limited partnership or the debtors' partnership interests, and thus the proposed plan was confirmed as feasible. There is, however, no absolute guarantee of repayment. Accordingly, I find that it was reasonable for LTI to commence and prosecute its claim against SCTC under the pledge agreement, even after the debtors' bankruptcy filings. And as such, LTI may be reimbursed for reasonable counsel fees and expenses incurred in that representation.

In reviewing all of the time sheets submitted by LTI counsel, however, I agree with the debtors' alternative contention that not all services rendered by the two law firms in connection with that state court litigation are reimbursable. Additional reductions in the amounts of counsel fees claimed by LTI for work done in connection with this bankruptcy case under section 506(b) are warranted as well.

B.

The Pittsburgh, Pennsylvania law firm of Vuono & Gray, LLC provided legal services to LTI both before and after the debtors' bankruptcy filings. LTI seeks an allowance of $423,932.50 in fees and $8,094.84 in expenses connected with eight categories of services. Ex. LTI-16. Three of those categories, however, constitute the vast majority of the services provided: "loan enforcement" prior to the bankruptcy filing; state court litigation against SCTC in Colorado; and time spent representing LTI in the debtors' chapter 11 bankruptcy cases. Id. LTI also seeks reimbursement for time spent by the Vuono firm in: "loan enforcement" after the debtors' bankruptcy filings; representing LTI in appealing to the district court from this court's order denying LTI's motion to dismiss the chapter 11 cases as filed in bad faith; providing legal advice in connection with the above-captioned adversary proceeding and an appeal from an order and recommendation made in this proceeding now pending before the district court; Pennsylvania state court litigation; and filing UCC continuation financing statements.

Vuono & Gray submitted lodestar time records asserting that four attorneys provided 514.75 hours of legal services worth $143,241.25 in connection with

enforcement of LTI's rights as a creditor under the various loan documents.  These services began in February 2008 and were provided prior to the January 2009 bankruptcy filings.  After the January 2009 bankruptcy filing, the firm provided an additional 8.25 hours of services worth $1,895.00 related to "loan enforcement."

Although certain of the time entries are heavily redacted,  it is apparent that some of the legal services provided by the Vuono firm categorized as loan enforcement concerned discussions with the debtors and their counsel about loan repayment, as well as discussions with LTI's principal, Frank M. Coughlin.  The legal services also involved review of governance actions taken by the debtors.  Furthermore, Vuono & Gray communicated with Colorado counsel in preparation for commencing litigation in that forum.  It also appears from these time records that Vuono & Gray prepared a draft complaint to be used in the Colorado litigation, and reviewed a summons and litigation cover sheet prepared by Colorado counsel, as well as a revised form of the complaint. The Pittsburgh firm even prepared requests to appear in the Colorado forum pro hac vice.

In addition, the Vuono firm also asserts that it provided 459.75 hours of services in connection with the Colorado state court litigation, divided among four attorneys, and valued by the firm at $115,967.50.  A review of the firm's sometimes heavily redacted time records shows that these services commenced on January 23, 2009—the date the Colorado litigation was filed.  From these records, it is clear that the Vuono firm spent numerous hours communicating with Colorado local counsel and then with LTI's principal, Mr. Frank Coughlin, concerning the litigation.  It also participated in conference calls with LTI and its Colorado counsel.

Moreover, the Vuono firm reviewed court notices, orders, and pleadings filed in connection with the state court litigation, and spent hours summarizing these pleadings and occasionally revising them. It entered an appearance in Colorado state court. Along with local counsel for LTI, it participated in pretrial conferences via telephone. It also, however, performed its own legal research and drafted a motion and memorandum in support of dismissal of state court counterclaims against LTI, and then reviewed comments made thereto by local counsel. Similarly, the Vuono firm researched and drafted a summary judgment motion filed in state court against SCTC, drafted discovery responses on behalf of LTI, and reviewed document production. Indeed, the Vuono firm prepared for and attended a deposition of CoBank's vice president, Kenneth Allen. It also drafted LTI's motion in federal court to remand the removed litigation back to state court.

In addition to time spent in connection with the Colorado litigation, the Vuono firm discloses having spent 512.25 hours representing LTI's interests in the debtors' chapter 11 bankruptcy cases. The redacted time sheets[16] reveal that the Vuono law firm spent many hours communicating with LTI's bankruptcy counsel, Reger Rizzo & Darnall LLP, either via telephone or email, communicated with LTI's principal, Frank Coughlin, reviewed and proposed changes to bankruptcy pleadings prepared on LTI's behalf by the Reger law firm, reviewed schedules, pleadings and other documents filed by the debtors in their bankruptcy cases, reviewed all bankruptcy court orders and decisions, reviewed bankruptcy court hearing transcripts, participated with bankruptcy counsel in

---

[16]Some time records, such as those on 1/20/2010, 3/31/2010, 4/1/2010, and 4/6/2010, were so heavily redacted that no information about the reasonableness of the services rendered is determinable.

discovery matters, including expert witness reports, and discussed overall strategic issues

with Mr. Coughlin and bankruptcy counsel.  Again, the Vuono firm appeared in the cases

pro hac vice and even traveled to Philadelphia to attend the section 341 creditors'

meetings along with bankruptcy counsel and attended a few court hearings in conjunction

with local counsel.  The firm also forwarded to bankruptcy counsel copies of documents

obtained in the Colorado litigation.

      Unlike the state court litigation, it does not appear that the Vuono firm

drafted any pleadings filed in the debtors' bankruptcy cases.  Those pleadings were

drafted by the Reger firm, but were reviewed by the Vuono firm.[17]

      For example, LTI filed a notice of appeal from this court's denial of its

motion to dismiss the chapter 11 bankruptcy cases.  That appeal was overruled by the

District Court.  See In re South Canaan Cellular Investments, LLC, 420 B.R. 625 (E.D.

Pa. 2009).  Although all the pleadings filed on behalf of LTI in connection with its appeal

were prepared and submitted by the Reger law firm, the Vuono firm seeks 11.75 hours of

---

[17]The following two time entries submitted by partner John A. Vuono, Esq.
exemplify the role played by the Vuono firm in representing LTI's interest in the debtors'
bankruptcy cases:

> 4/7/2009 1.0 hours  Office conference to discuss latest developments and
> need for conference call with the bankruptcy lawyers; review recent
> developments [redacted]; prepare agenda for meeting with bankruptcy
> lawyers; talked to Mr. Coughlin and scheduled meeting for tomorrow.

> 4/7/2009 0.5 hours Exchange emails with attorneys re Rizzo's discussion
> with Santamour, offer to produce roaming agreement for attorney's eyes
> only. [redacted]; schedule conference call to follow up; email to client.

Louis Rizzo, Esq. is with the LTI's bankruptcy counsel, the Reger firm, and Gretchen Santamour,
Esq. is with the firm representing the debtors in their bankruptcy cases.

reimbursement compensation spent reviewing those submissions, reviewing the debtors's

submissions to the district court, reviewing the district court's decision, and discussing

strategic matters with bankruptcy counsel and with Mr. Coughlin.

The debtors commenced the above-captioned adversary proceeding, seeking

judgments against Mr. Coughlin individually and LTI, as well as objecting to LTI's

secured proof of claim. Again, the Reger law firm represented both defendants in this

court. The Vuono law firm discloses that it spent 78.75 hours in representing the

defendants' interests in that litigation. As with the LTI representation in the underlying

bankruptcy case, Vuono's role, primarily undertaken by John A. Vuono, Esq., consisted

of review of pleadings with suggested revisions, review of court orders, communication

with Mr. Coughlin, participation in strategic decisions, and communication with

bankruptcy counsel.

Finally, the Vuono law firm lists 3.25 hours spent in connection with the

district court review of my order and recommendation in this adversary proceeding, and

2.50 hours in Pennsylvania state court litigation. No time records are included in exhibit

17 to explain the nature of the services rendered in those two categories.


C.


LTI has been represented in the Colorado litigation against SCTC by the

Denver law firm of Sander Ingebretsen & Wake P.C. along with Vuono & Gray LLC.

The Sander firm provided time sheets listing 406.40 hours of services provided by three

attorneys, with more than 90% of that time spent by one partner, and valued by the firm at

$137,128.50. Ex. LTI-17. Although some entries have redactions, the redactions are far fewer than those made by the Vuono firm.

The Sander firm first began providing services in October 2008, and those services consisted of discussions with an attorney at the Vuono firm, considered to be corporate counsel to LTI, in order to obtain background information concerning LTI's disputes with the debtors and SCTC, and ultimately preparations for potential litigation.

Prior to January 25, 2009—the date the debtors filed their voluntary bankruptcy petitions—documents drafted by the Sander firm were sent to and reviewed by the Vuono firm. There does not appear to have been any direct communication with LTI. After January 25, 2009, conferences (presumably by telephone) occurred among the Sander firm, the Vuono firm, and the counsel in the bankruptcy cases, the Reger firm. Those conferences discussed "bankruptcy issues." See ex. LTI-17 (Jan. 26, 2009 time entry).

The Sander firm was local counsel for LTI in the SCTC litigation in Colorado, which litigation included the removal of the state court lawsuit to federal district court by SCTC and the subsequent remand back to state court as requested by LTI. Sander also reviewed some bankruptcy pleadings and met with other LTI counsel to coordinate discovery issues.

Many time entries submitted by Sander reflect consultations with the Vuono firm. See, e.g., ex. LTI-17, at 7-9. Sander also provided services in connection with discovery, such as preparing for depositions, reviewing transcripts and document production, compiling exhibits, and filing discovery motions. Sander also prepared a motion to strike SCTC's jury demand, attended state court conferences, prepared the

49

proposed case management order, and performed some legal research, including research related to local procedural rules.

D.

The debtors argue that all of the legal services provided by Vuono & Gray LLC after January 23, 2009 were duplicative of the services provided by the Sander firm in the Colorado litigation and by the Reger firm in the debtors' chapter 11 bankruptcy cases. The debtors also contend that much of the 514.75 hours of time spent by this firm prior to the Colorado litigation should be considered unreasonable, because redactions make determination "impossible" and because those time entries that were not redacted disclose very little services in the nature of negotiations, drafting, or legal research.

As the debtors note, courts have been concerned when a secured creditor seeks an award of counsel fees under section 506(b) both for services rendered by local bankruptcy counsel as well as non-local corporate counsel. "[I]f local counsel is engaged then special care must be taken to avoid duplication of efforts." In re Scarlet Hotels, LLC, 392 B.R. 698, 706 (B.A.P. 6th Cir. 2008).

For example, in In re Nixon, 400 B.R. 27, 40 (Bankr. E.D. Pa. 2008), aff'd, 2009 WL 1845229 (E.D. Pa. 2009), the bankruptcy court disallowed time spent by non-bankruptcy counsel for an oversecured creditor when the services rendered by such counsel mainly constituted review of bankruptcy counsel's work product:

> Clever's work appears to duplicate or simply review
> Kranson's work product. Moreover, I found that his
> appearance at hearings did not assist Kranson in any way that
> I could observe. While Foster, a lawyer himself, may have

50

wanted the comfort of having his long-time attorney review
and supervise everything done by his "bankruptcy counsel," I
question whether he would pay almost $30,000 for what was,
at best, a belt and suspender approach to legal staffing. In any
event, this approach was not objectively reasonable.

LTI responds to the debtors' challenge by asserting that the services

rendered to LTI by the Vuono firm constituted, in part, coordination of the activities of

local state court and bankruptcy court counsel, and so should be viewed as reasonable:

As soon as the enforcement action was commenced in
Colorado, the Debtors filed for bankruptcy protection in this
Court, but SCTC did not. The Vuono firm continued to
coordinate the activities of the Reger firm and Sander,
Ingebretsen & Wake, P.C. in what developed into a two-front
war to enforce and collect the loan obligations. The Vuono
firm's familiarity with the acquisition of the loan from
CoBank and with the complex corporate structure of the
Debtors and related entities, as well as its long relationship
with LTI and Mr. Coughlin, enabled it to work closely with
both the Reger firm and Sander, Ingebretsen & Wake, P.C. to
develop the strategy and participate in the litigation in both
proceedings at each step along the way.

LTI Post-Trial Memorandum, at 27.

Although I agree with LTI that some coordination between the Colorado

state court litigation and the bankruptcy cases was appropriate—some of the legal issues

and thus discovery necessary were similar—I also concur with the debtors's position that

protection and enforcement of LTI's rights as a secured creditor did not justify an

expenditure of more than $300,000 in counsel fees to achieve that coordination and

participation in both fora.

Bankruptcy counsel and Colorado counsel were competent to represent

LTI's interests in the two court systems. While LTI was free to spend its own funds to

use corporate counsel to review the legal services provided by its other attorneys, it is

unreasonable duplication under section 506(b) to require the debtors' bankruptcy estates to reimburse LTI for having the Vuono firm review all pleadings and court orders filed, when other counsel were providing the same services. Similarly, it was unnecessary and duplicative for the Vuono firm to actively participate in all discovery and appeals. See, e.g., In re California Properties No. 1, Ltd., 132 B.R. 191, 193 n.8 (Bankr. M.D. Ala. 1991) ("local counsel able to render the services in question was readily available, thus obviating the necessity of travel."). Similarly, when the Vuono firm actually drafted the pleadings in the Colorado litigation, it is unreasonable to compensate LTI for all of Sander's time spent in review.

I also agree with the debtors that the heavy redaction of the Vuono time records defeats LTI's effort to demonstrate that certain services were reasonable under section 506(b). For example, the Vuono time sheets reveal 13 time entries totaling 8.25 hours that are classified by LTI as concerning post-bankruptcy enforcement of its rights as a secured creditor. Those services apparently are viewed as distinct from legal services in connection with the debtors' bankruptcy cases. Given the extremely limited information provided by these time sheets (e.g., "review email," "update"), as well as the existence of the bankruptcy stay against enforcement efforts, I cannot determine that such services were reasonably provided. As the time records before commencement of the Colorado litigation reflect limited negotiations with the Co-Borrowers and limited preparation for such litigation, it also appears that some of the time spent by the Vuono firm was connected with LTI's assignment of loan rights from CoBank, an activity that falls outside the scope of the attorneys' fees provisions of the loan documents.

52

After reviewing all of the time records, and disallowing for duplicative, unnecessary or indeterminate services, I conclude that $140,845.50 in services rendered by the Vuono firm are reimburseable under section 506(b).

Insofar as the legal services provided by the Sander firm are concerned, a more modest reduction is appropriate. Although considerable time was spent consulting with the Vuono firm, such consultation served in most instances as a substitute for communications with LTI. Where it did not, the time spent was unnecessary and duplicative. Also unnecessary and duplicative was some time spent by Sander in reviewing pleadings drafted by Vuono.

Upon consideration of all of the Sander time records, I conclude that $104,800.00 was reasonably incurred and reimbursable under section 506(b).[18]

E.

The law firm of Reger Rizzo & Darnall LLP represented LTI in these bankruptcy cases. This firm assigned tasks to 10 attorneys, totaling 3,486.60 hours, and values these serves in the amount of $792,048.50. The services of the Reger firm on behalf of LTI may be classified[19] as follows:

General Case Administration; Motion to Dismiss Bankruptcy
Case; Appeal from Denial of Motion to Dismiss Bankruptcy

---

[18]The debtors do not specifically challenge any expenses incurred by the Vuono and Sander firms: $8,094.84 and $4,693.36 respectively. Exs. LTI-16, 17.

[19]Unlike the Vuono law firm, the Reger firm did not separately classify the services it rendered. See generally Local Bankr. R. 2016-3(c). Thus, the classifications listed were developed upon my review of the law firm's time sheets.

Case; Application to Employ Debtor's Counsel; Objection to
Debtors' Multiple Disclosure Statements; Preparation of
LTI's Disclosure Statement and Proposed Chapter 11 Plan;
Challenge to the Bauknight Proof of Claim, including Claim
Estimation; General Administration of Adversary Proceeding;
Motion to Dismiss Adversary Proceeding; Jury Trial Issues in
Adversary Proceeding and Motion to Sever; Discovery in
Adversary Proceeding; LTI's Motion to Withdraw Reference
in Adversary Proceeding; Discovery in Bankruptcy Case;
General Administration in Colorado Litigation; Removal of
Colorado Litigation; Remand of Colorado Litigation;
Discovery in Colorado Litigation; Opposition to Debtors'
Joint Plan of Reorganization; and District Court Review
Sought by the Debtors of Ruling on LTI's Motion to Dismiss.

The debtors complain that some of the services performed were

unnecessary, of no value to LTI, or involved overlawyering of certain tasks. Specifically,

the debtors focus upon time spent by the Reger firm in litigating: LTI's unsuccessful

motion to dismiss these bankruptcy cases and its appeal of the adverse ruling; LTI's

opposition to the debtors' employment of bankruptcy counsel; preparation and filing of

LTI's proposed disclosure statement and plan; objection to the debtors' proposed plan and

disclosure statement; litigation of certain motions in this adversary proceeding; time spent

representing individual defendant Frank Coughlin; litigation of discovery issues and Rule

2004 examination; opposition to the debtors' request to extend plan exclusivity; objection

to an unsecured proof of claim filed by Bauknight, Pietras & Stormer; and all services

incurred by the Reger firm in connection with the Colorado litigation against SCTC.

After considering the debtors' challenges, I conclude that some of the

services rendered were not reasonably necessary for the enforcement or protection of the

creditor's secured claim or its collateral. For example, LTI filed a motion to withdraw the

reference in this adversary proceeding and then withdrew that motion. It also reversed its

position on the issue of jury trial in this proceeding.

In addition, although some categories of legal services provided were reasonably necessary, the amount of time charged is excessive. For example, the Reger firm billed almost $116,000 for services rendered in seeking dismissal of the debtors' chapter 11 cases under section 1112 and subsequent appeal. Although there was an evidentiary hearing, the amount of time spent on this issue was excessive. It also reveals about $48,000 for time spent preparing LTI's own proposed plan and disclosure statement, although much background in the disclosure statement was borrowed from the debtors' own proposal, there were few classes of creditors, and the structure of any plan proposed by LTI was not complicated. Moreover, the Reger time sheets contain redactions of certain descriptions in its time entries making review of reasonableness impossible.[20]

I agree with LTI that many of the services rendered on its behalf by the Reger law firm in these bankruptcy cases were reasonably necessary to protect or enforce its rights as a secured creditor. For example, I reject the debtors' argument that any time spent by the Reger firm in connection with the Colorado litigation was duplicative. As the debtors have acknowledged previously, there is a factual and legal overlap between the instant adversary proceeding and the Colorado litigation warranting some limited involvement by the Reger firm on behalf of LTI. The motion to dismiss under section 1112, although unsuccessful, was a close question and certainly not frivolous.

Similarly, although LTI is seeking reimbursement from the debtors for Reger's defense of Mr. Coughlin in his individual capacity in this adversary proceeding, such services fall within the scope of section 506(b).

---

[20]See, e.g., 2/24/2009; 2/25/2009; 3/2/2009; 3/3/2009.

55

The debtors have made claims against Mr. Coughlin for breach of various fiduciary duties.  Their sole affirmative claim against LTI in this proceeding was for aiding and abetting Mr. Coughlin in committing such a breach.  The ruling in this court dismissing all breach of fiduciary duty claims against Mr. Coughlin resulted in the automatic dismissal of the aiding and abetting claim against LTI.  The interrelationship of the claims against defendants LTI and Coughlin makes the representation of the latter reasonably necessary for the representation of the former.

In reviewing the time records submitted by Reger Rizzo & Darnall LLP, I now conclude that $594,380.00 in services rendered by the Reger firm were reasonable under section 506(b).  There has been no challenge made to the $62,872.80 in expenses incurred.

Accordingly, LTI's allowed secured claim includes attorneys' fees of $840,025.50, and expenses totaling $75,661.00.  When added to the principal and accrued interest allowable, an order will be entered fixing LTI's allowed secured claim under section 506(b) through the effective date of the debtors' confirmed plan at $12,023,543.21.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: August 19, 2010